We'll hear argument now in Case 23-753, the City and County of San Francisco v. Environmental Protection Agency. Ms. Steele? Mr. Chief Justice, and may it please the Court, Section 301B1C of the Clean Water Act assigns EPA the job of setting the effluent limitations necessary to meet and implement water quality standards. The water quality standards are not the limitations themselves. Instead, they set the goals for the water body. EPA must translate those goals into discharge limitations. The generic prohibitions fail this task. As Judge Collins explained below, the generic prohibitions erase the distinction between water quality standards and discharge limitations, making them one and the same. The generic prohibitions revive the very cause-or-contribute standard Congress repealed, and they do not function as discharge limitations. As the Second Circuit recognized, they add nothing that tells a permit holder how to control its discharges. EPA claims it uses the generic prohibitions as a backstop, an insurance policy against changing circumstances, but the Clean Water Act already gives EPA all the tools it needs to address uncertainty. EPA can reopen, modify, or terminate a permit when conditions change, and it can exercise its statutory authority to protect public welfare in emergencies. What EPA cannot do is expose permit holders to liability based on receiving water conditions it cannot control. The generic prohibitions are also inconsistent with the Act's permit shield. The shield protects permit holders from liability as long as they comply with their permit terms. But by imposing indeterminate requirements, the generic prohibitions prevent permit holders from relying on the shield's protections. San Francisco is therefore exposed to crushing criminal and civil penalties, even when it otherwise complies with its 300-page permit. I welcome the Court's questions. In your permit, Phase 1, doesn't that contain a narrative limitation? So San Francisco's permit is a Phase 2 permit, so we're not subject to the CSO policy for Phase 1. But Phase 1 describes a narrative condition. Our concern about the generic prohibitions is not that they are narrative. It's perfectly fine for EPA to use conditions that are narrative, narrative water quality-based effluent limitations. And that's exactly what the CSO control policy requires. In EPA's own guidance, it describes what's required under Phase 1, and it describes that as a narrative water quality-based effluent limitation. With this permit, what is at bottom the problem? What at bottom is the problem is that permit holders don't know what they need to do to comply. We know how to comply with the 300 pages of our permit, which tells us our discharge limitations that we need to achieve. The problem with the generic prohibitions is that they don't tell us what in addition that we need to do, and if I could provide an example of that. One of California's water quality standards is no objectionable algae bloom should form in the water body. San Francisco doesn't know how it must control its discharges to prevent that condition from forming in the water body. And we can't know, because whether a condition will form in the water body will necessarily depend on what other permit holders or other non-point sources are adding to the water body and the flow of the water itself. What San Francisco can control is our own discharges. We cannot control the receding water conditions. Are the water quality standards in state law? I thought that the EPA permits were just incorporating obligations that already existed in state law. Am I wrong about that? I think that's not quite correct, Your Honor. The water quality standards set the goal for the water body, but they aren't self-executing. They have to be put into a permit. And what 301B1C requires is that EPA meet and implement the water quality standards, which means translating them into a permit limitation. Isn't EPA ‑‑ I thought the statute allowed for any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance established pursuant to any state law. So California has established certain water quality standards. Are those independently binding on the cities and municipalities in California? They are not binding. They are only binding as a permit limitation. And that's the problem here is that we don't ‑‑ You have to have permits under state law so that they get bound. You get bound through the state permitting process then. The permit issue here is the issue that ‑‑ No, I understand. But I'm just ‑‑ I guess my big problem is that I'm trying to understand why you find these permit provisions so onerous or problematic when they seem to just incorporate standards that already exist under state law that you would have to follow anyway. The standards are not self‑executing, so we don't have to follow them anyway. They set the goals for the water body, but they're not limitations on us themselves. So they are not binding on us. Ms. Seely, I mean, there are lots of different kinds of regulations in the world. Some people like some kinds. Some people like other kinds. Some regulations are really prescriptive. Do this, this, this, and this. And then, you know, some people hate those kinds of regulations. They'd rather have regulations that are less prescriptive that say, here's the goal, you decide how to meet it. That gives a party more flexibility and so forth. So, you know, some people, you know, it's ‑‑ there's got to be something in this statute that tells you that the agency can't decide to go the less prescriptive, more flexible, you decide how to meet it, this is the goal route. And I don't see anything in this statute that does that. I disagree, Your Honor, that this provides a flexible standard. Let's talk about the statute. Like, what in the statute prevents the agency from saying, in addition to or instead of the highly prescriptive, you know, you can only discharge X amount, we want to set a goal and we want to tell you that you're obligated to not contribute to violating that goal. So what the statute provides is that EPA must meet and implement the water quality standards. And those are transitive verbs. They necessarily, in our view, require taking concrete steps to achieve the goal. To me, this regulation, what does this regulation do? It says, go meet and implement the water quality standards. Because you were exactly right in what you said to Justice Jackson, is without this regulation, or not this regulation, but this condition in the permit, you're not independently obligated to ‑‑ they're not ‑‑ those standards are not enforceable against you. It's the permit condition that makes those standards enforceable against you by the EPA. So that's what this condition does. It's prescribing that you have to meet water quality standards. Like, how more clearly could you meet this statutory language than that? So the problem is that it can be used as grounds for enforcement afterwards, but it doesn't tell permit holders in advance what we must do to control our discharges. The problem is that there are discharges, and we get a huge amount of them in the Amici briefs, of discharges that weren't anticipated. You were fine at the time of the permit, and then all of a sudden, you've got chlorinated or potable water into the waters. So if the water standards are not self‑executing, which you admit, if they're not in the permit because they haven't been put into the permit, then what you're saying is, well, you can't do anything immediately, EPA. You have to start a review process that takes months and sometimes years to amend the permit and do something about it. This instead says to San Francisco, you should be monitoring the water. Don't let it exceed the water quality standards that we met and set together. Now you implement the changes that you think are appropriate to stop this unexpected discharge. I don't know why that's the wrong way to look at this. I think it's the wrong way to look at it, Your Honor, because first of all, we are not saying EPA cannot take immediate action. The statutory scheme already provides EPA with emergency powers. They can act immediately to protect public welfare under Section 1364. How can they do that? They can't go to court unless there's a permit violation. They can go into court under their emergency powers. Under their emergency, but we have to go to that extreme. So how do we get San Francisco to do something about its monitoring obligations? So San Francisco's permit is supposed to monitor and look at things, and if things are getting out of control, figure out how to put them back into control. So San Francisco's permit requires monitoring and receiving water conditions, as you've noted. You'll see that in the petition appendix starting at page 226. So in this permit, this is not a permit involving entities, it's multiple entities that are discharging into most of these waters. To most of these waters, it's one permit holder, the city of San Francisco. It's combining sewage and rainwater runoff, correct? So it knows all of the point sources that contribute to that water quality have affluent limitations because you can test those and see whether they're meeting standards. So if something unexpected happens, it's because one of those water sources has gone awry, correct? That is not correct, Your Honor, and I have two responses to that. First of all, San Francisco is not the only discharger or contributor to the water body. There are eight discharge points that issue in the permit. Those are the point sources that it's supposed to be. San Francisco has its own discharge points, and there are eight of them. One of them, I will concede, is fairly far out into the ocean. We are the only source for that one. But the other seven have many other contributors to the water body very close nearby. And if I can give you an example, just a couple weeks ago, there was a bacteria spike near one of those discharge points. It's a point that we are not currently using, so we know we did not cause that spike, but someone else did. Had we been contributing to the water, had we been discharging at the time, we would necessarily have been contributing to that condition, and we would be subject to liability. But that's my point, which is you can't get past the obligation to meet the water standards unless you put them into the permit. So the way that EPA can achieve its goals here is to set a discharge limitation in the permit. And if I can grab that. They should take each. I see in the water standards, they're very detailed on any number of discharges. You can only have X amount of feces in the water, X amount or Y amount of bacteria, pages and pages of measurements. You want them to write all of those, take the water standards, and instead of cross-referencing them and telling you to meet those standards, you want them to write each amount? So, Your Honor, EPA's own regulations require it to set an effluent limitation whenever there is a reasonable potential that a discharge will cause or contribute to a water violation. Well, that's the point I'm making. It does that. Where they're exceeding the limitation, it tells it what technology to put into place to reduce it. But if they're not exceeding it right now, how do they take care of the unexpected situation? The permit limitations are set in advance. So they're anticipating what the discharge will do to the water body. But if I can correct, I think what maybe is a misunderstanding, we don't have real-time monitoring of receiving water conditions. Under our permit, we monitor bacteria on a once-a-week basis and other things, including effects on animals, sediment. We monitor on a yearly basis, and it takes about nine months for the results to come back. So San Francisco cannot shift on a dime. We don't have the information necessary to know. I'm sorry. No one's asking you to shift on a dime. What they're asking you to do is to become responsible for doing what's necessary, not on a dime, but nothing in the EPA works on a dime, but to take the steps necessary to control situations that develop. So if I can provide another example of how this runs amok. By the way, I do accept that there are some provisions of the water standards that are charitably a little amorphous, you know, control for the color of the water. But I think that's an as-applied challenge. Can I just piggyback on that, if you'll let me?  When I hear you speaking, I hear one of two things. One is that to the extent that you have objections to particular ones of these water quality standards, they're too confusing, they're too vague, we can't figure it out, how can you tell between us and other dischargers? I mean, that does seem like a classic arbitrary and capricious question. So you would go and make an arbitrary and capricious standard as to those particular standards that are in the permit. I mean, the second way I hear you, honestly, is you're making a policy argument to either the agency or to Congress. You're making a policy argument to the agency, essentially, don't take advantage of your statutory authority in this way, because it's very confusing to us, the regulated party. Or you're making a policy argument to Congress. Go fix this statute so that the EPA can't do this. But what I don't hear you telling me is, like, what in the statute prevents the EPA from doing this? And, you know, as I said in my first intervention here, the policy arguments, they cut both ways. Some people like these kinds of standards, these kinds of standards. If the EPA couldn't do these standards, presumably they would do something else, which might be more prescriptive, which some parties might really hate. So that's such a policy argument that we can't figure out what in the statute prevents the EPA from doing this. So, again, I would point you to the requirement to meet and implement the water quality standard. As you noted, Justice Sotomayor, some of the standards are not, they don't translate easily into a discharge limitation for San Francisco. And I don't agree that it's a policy argument. We simply want to know what we have to do. I feel as though it's, when you say meet and implement, I feel that those statutory words, they're practically a description of these permit conditions. You know, they basically say, you don't have to do just the standard effluent limitations if you think that a regulation is, you know, further conditions are necessary to achieve the water quality standards. And the EPA is saying at the very least this. We have to obligate you and other entities with permits to comply with those water quality standards. And that's actually exactly what the statute allows the EPA to do. So I don't agree that you can meet and implement the water quality standards by simply sticking a term in the permit that says, do not cause or contribute to the violation of water quality affairs. They might as well have said, do not violate the Clean Water Act. It doesn't tell us anything. I thought the whole reason we have the water permit system is because the water quality system was a failure. Because it didn't tell people in any predictable way what they can and cannot do. That's exactly right. And Congress repealed that system. It replaced that system. I'm sorry. Keep going. It replaced that with a system where EPA is supposed to tell us our discharge obligations in advance. That was the entire basis for the Clean Water Act. And I thought the statutory hook that you were relying on in B1C, 301B1C, was the phrase any more stringent limitation necessary to meet water quality standards. And you read any more stringent limitation to refer back and mean effluent limitation. Is that your statutory hook? That's true, Your Honor. I would also point you to Section 301A sets the table for what the rest of Section 301B is going to accomplish. Absolutely. 301A sets effluent limitations. And then when it says any more stringent limitation, you say the fact that the word effluent is not there in context is obviously referring to effluent limitations and then meet water quality standards, right? That's correct, Your Honor. Sorry. But you say narrative is okay. And that's not an effluent limitation. We also have our own case that says it doesn't have to be an effluent limitation. And I still don't understand how you didn't forfeit this argument. First of all, it wasn't raised before the Ninth Circuit. It was mentioned in the dissent. But when you filed for certiorari, you didn't make this argument. And you now raise it. I was quite surprised when I read the question presented and started your brief and thought to myself, this is a new theory. How is that argument not forfeited? So, Your Honor, we do not object to narrative water quality-based effluent limitations. And an effluent limitation can be narrative. What an effluent limitation is- Just answer my question. Why didn't you forfeit this argument? Okay. We did not forfeit this argument because we've argued throughout this case, including you'll see at pages 24 to 34 of our opening brief. I'm asking about how you didn't forfeit it in your cert petition. So what we are challenging here is the generic prohibition. And how did you not forfeit it in the court below by not raising it? We're not a court of first impression. We did raise it in the court below, Your Honor. You'll see that- The Ninth Circuit didn't think so. I looked at your briefs from there. I don't think so either. The Ninth Circuit held that 301B1C is not limited to effluent limitations, which are restrictions on discharges. It did reach that holding. You'll see that at pages 32 to 33 of the Ninth Circuit's decision. And we argued this to the Ninth Circuit. On the more stringent question, if it's a different limitation, it's more stringent, isn't it? Meaning you're defining more stringent as being more hardship on men than the effluent limitation. But doesn't that answer Justice Kagan's point, which is any time you have another obligation, it's more stringent? We don't agree that more stringent just means additional. I think if Congress had meant that, it would have said so. And I think that's actually an important part of the statute. I'm not sure I understand that. I mean, these do impose obligations on you above and beyond what the technology-based limits do. Isn't that right? You have to do more. I don't agree, Your Honor. And that's because we cannot tell. It does not tell us in advance how to control our discharges. Well, either you have to do only what the technology-based limits tell you to do, or you have to do more. But this does not tell us what more we would have to do. Well, for example, suppose a technology-based condition says, you know, don't discharge more than 75 gallons of sewage. And now, in addition to that, a water-quality-based condition says, don't cause or contribute to meaningful discoloration. Isn't it more stringent than the first condition standing alone? Because on a particular day, you might have to cut your discharges more to 60 gallons per day. Then it's more stringent. Now it's 60 gallons per day because that's what's necessary to prevent discoloration. I have two arguments to that, Your Honor. One is this doesn't tell us how to control our discharges. So in our view, it's not more stringent. And the second is that we judge permit terms at the time that they are set. When they are set, we cannot tell if it's a more stringent requirement or not, because depending on conditions in the water body, it can be either more or less stringent at that moment in time. And so, therefore, it's not a more stringent restriction. Do you dispute that Congress was attempting to have a backstop with respect to requiring or allowing for any more stringent limitation? I mean, the word any in here also, it seems to me, does work to suggest that we don't have to stay within the world of effluent limitations. So how do you account for that? And isn't the point of having this that Congress understood that the 1A effluent limitations might not be sufficient, so the authority was given to prescribe any more stringent limitation? So I think you have to read any in context. I think my friends on the other side read 301B1C as meaning any limitation. That cannot be right. They've read out the rest of the words of that section. I don't believe that 301B1C is meant to be an all-encompassing backstop. I don't agree with that. What is it doing? I mean, we already have a provision that allows for or authorizes effluent limitations, and then we get to this one that says you can put in a permit any more stringent limitation. And speaking of reading out the words, it says including those necessary. So it's not even clear that those necessary is the sum total of the limitations. It says any more stringent limitation. So doesn't that, just on its textual reading, suggest we are beyond the effluent limitations that were previously authorized? So a couple of responses that I'd like to give you if I may.  The first is that what an effluent limitation is is a restriction on discharges of pollutants. We know from Section 301 that the entire section is about a restriction on the discharges of pollutants. So we believe 301B1C is also about an effluent limitation. But it's necessarily narrow in scope, and if I can explain why. So technology-based effluent limitations, which are set under Section 301B1A and B, are effluent limitations that require controls using the best practicable technology that's economically feasible. What Section 301B1C allows is additional controls regardless of their economic feasibility, regardless of cost. So those are necessarily a limited thing. They are used only when more stringent, only when necessary to meet and implement. I understand that point, but what do we do with the fact that Congress chose, I think, to codify the EPA's interpretation of this, of the CSO control policy? And that policy, is my understanding, explicitly endorsed the kind of permit provisions at issue here, those that regulate sewage treatment, that incorporate water quality standards beyond effluent limitations. Do you dispute that Congress endorsed the kinds of permit provisions that exist here? Absolutely. We absolutely dispute that. So my friends on the other side are not relying on the CSO policy as their source of authority, and wisely so, because the CSO policy does not give them the permission to put in conditions like the generic prohibitions. We are a Phase II permit, which expressly requires water quality-based effluent limitations. Even under Phase I, Phase I allows narrative water quality-based effluent limitations. There's nothing in the CSO policy that suggests that Congress, that EPA could simply impose something like the generic prohibitions, leave San Francisco to figure out its discharge obligations on its own. There's nothing suggesting that Congress had that in mind or blessed that system. In fact, when Congress was asked, do we want to leave permit holders to figure it out for themselves or assign EPA as the agency to set limitations, it chose the latter approach. Thank you. So, Justice Thomas, any further? Are there, not your case, but are there any provisions, is there any prohibition in 1311 against EPA having the generic limitations in a plan for someone else? Just generically, not you. Is there a prohibition? Yeah. Are they precluded from having generic limitations? I don't think there's anything expressly precluding them, but except that they are not authorized to do so, right? EPA only has authority when authorized, and so I think Section 301 is silent about generic prohibitions. It doesn't authorize them. Well, let me ask, can EPA impose generic limitations on anyone? No. Why? Because they point to Section 301B1C as their only source of authority to impose generic prohibitions, and that provision does not allow it. And why is that? Because what can be imposed under Section 301B1C is limitations on discharges. Those are effluent limitations. They need to tell permit holders their obligations. That's the entire point of that section and its requirements. So by imposing a generic prohibition, they're simply telling us to figure it out for ourselves, which we think is contrary to the statutory scheme. So would you have an arbitrary and capricious claim if you did not bring this as a statutory claim? Yes. Justice Alito? The government says that there are no other significant point or non-point sources of pollution around the southwest ocean outfall. Assuming for the sake of argument that that is true, I heard you dispute it earlier in your argument, but assuming for the sake of argument that it is true, why couldn't you then figure out what is necessary for you to do to comply with the water quality standards? So if I can just clarify first, there are eight outfalls at issue. So they're saying at one of them that is true. They don't contest at the other seven that is not true. But the reason is, first of all, Congress assigned EPA this task, not us. But the practical answer is that we can't know what we can discharge without knowing in real time, minute by minute, what the conditions are in the receiving waters. That will include the water flow, its currents, and also what others have added to the water body. For instance, if we're trying to meet a- Well, it sounds like what you're saying there is not that you object to the fact that EPA hasn't told you what you need to do, but that there is really no practicable way of specifying in advance what you are required to do, and therefore you can continue to have these combined sewer overflow events where you're discharging raw sewage into the Pacific Ocean. There is a way to tell us in advance, and EPA has done so. It has set effluent limitations in our permit. What EPA hasn't told us is what additional we need to do under the generic prohibition. All right. Thank you. Justice Sotomayor? You haven't told me what you do with unanticipated discharges. You ignore them until the permit is amended. Is that your answer? If a discharge is not anticipated, if it wasn't disclosed to the agency, then it's an unauthorized discharge. It's simply prohibited under section- No, it's not, because the permit tells you what you can or cannot discharge, and how much. And that's based on what we know you're doing. If you're okay on day one in discharges, we're not going to tell you not to do more. We're giving you permission to discharge. Right. So if you have not been given the authority to discharge a certain something, a certain constituent- The way the permit operates is, with the permit, you can discharge anything that the permit tells you you can't. It works in reverse. It tells you you can't do this thing more than that amount. If it doesn't tell you you can't do this thing, you can continue doing this thing until the permit tells you you can't. The way it works is that the permit holder goes to EPA and says, this is what we plan to discharge. And then, if you have disclosed that to EPA, then they set the limitations, and that's the scope of your ability. So what they should do is what you told me earlier not to do. They should come in and tell you, using the technology you're using now, ensure yourself that you're not doing more than X amount of feces in the water. Would that be an okay limitation? Certainly. EPA can say, this is the limit- So rewrite the water quality standards. Just bring them all in to the permit, instead of cross-referencing them, and say, you can't have, at this point source, more than X amount of feces discharged. I suspect that Justice Kagan is right, that if they start doing something- because computers now can make that a very easy task- then you'll come in and say the permit is not comprehensible, because it's so long and convoluted. So our permit is already quite extensive, and I- No, we'll let you. We're just asking to add more. I'm not asking for EPA to add more. What I'm asking is for clear guidance to permit holders about what we have to do to comply with our permit. And I will say that I'm not sure that is true, that others like this. The regulatory community has lined up in the amicus supporting San Francisco. But in terms of what EPA can do, EPA can reopen the permit. It can modify a permit. Months and years. If it has any reasonable basis for concern, even anticipatory, right? If it anticipates that there may be a problem causing- Months and years. I'm sorry? Months and years. I mean, it can take as little as six weeks to three months- Only if you're cooperating. All right. I'm not sure. Thank you. That's fine. Justice Kagan? If I understood your response to Justice Thomas, Justice Thomas said what prevents the EPA from doing this. You said 1311B1C doesn't authorize it because this is not an effluent limitation. But, of course, 1C does not talk about effluent limitations. 1C just talks about limitations. 1A talks about effluent limitations. 1B talks about effluent limitations. You were adding a word to 1C to get effluent limitations there, weren't you? No, I disagree that we're adding a word. Well, you're definitely adding a word because there's only limitation there. So Congress used limitation as a shorthand for effluent limitations throughout this section. And if I can explain. So Section 301A, not 301B1A, but 301A, tells us that the universe of Section 301 is about restrictions on discharge of a pollutant. That's the very definition of an effluent limitation. So we believe that the limitations throughout, and the title also suggests that the limitations throughout Section 301 are limitations on discharge. And throughout the statute, it says effluent and other limitations. And then in this particular section, it says effluent limitations, effluent limitations. And then when it gets to this kind of backstop provision, if something else is necessary, it just says limitations. Okay. I have another question for you, which is, you know, you spend a lot of your brief talking about this legislative history of the statute and suggesting that what the statute was designed to do was to go from a water quality-based system to an effluent, you know, to a technology-based effluent limitation system. And that's, you know, I suppose if you really wanted to write the picture broadly, you might say that. But there are plenty of places in this statute where water quality makes an appearance. And indeed, it makes an appearance in this very provision, which is the source of authority for what the EPA did here. You know, it says, well, if the effluent limitations aren't doing enough, the EPA can do other limitations that are necessary to meet water quality standards. And that's what the text says. We usually don't look at, like, the broadest possible reading of legislative history to do something that's exactly counter to what the relevant textual provision says. It's absolutely true that Congress preserved water quality standards, but they preserved them as a basis for setting discharge limitations. So there's no conflict between preserving water quality standards and setting discharge limitations. In fact, that's the way that you preserve the environment. That's the way you protect water quality standards is you tell permit holders in advance what we must do to control our discharges. But the question presented here is about the-  Justice Gorsuch? Ms. Steele, as I understand your argument, I just want to make sure I understand it, there are two arguments. One is that B1C should be read to regard effluent limitations. That's your primary argument. I had thought in the briefs there was a backup argument that, nonetheless, whatever it has to be, it has to be a limitation on your discharges, given that that's what 1311A is all about, the discharge of any pollutant by any person except a specified year is unlawful. And that whatever a limitation is, it can't be the applicable water quality standard itself, because that is used in contradistinction with limitations throughout the statute. Is that correct? That is correct. I would only quibble with the idea that if there's a primary and secondary argument, what a restriction on discharges are is an effluent limitation. So I think those arguments are one and the same. But if we disagree on that, or at least don't want to reach it, the secondary point remains.  We have to deal with it. Absolutely, that's correct. I mean, the question presented here is about whether the generic prohibitions are authorized by law, and those generic prohibitions recreate the statutory scheme Congress rejected, so we think they are not. Thank you. Mr. Cavanaugh? A few questions. Just to pick up on Justice Thomas's question when he asked if anything prohibits, your response, and I just want to make sure I have this clear, was nothing in the statute authorizes something like the generic limitations, correct? That's correct. And that, in your point about water quality standards, I want to make sure, I think with Justice Gorsuch, the water quality standards are the goal or the end, but the statutory means to that end that are authorized by the statute are the effluent limitations. That's exactly correct. And when you say narrative effluent limitations, I think footnote 22 of your brief talks about that, and you've mentioned an oral argument. Can you, and Justice Sotomayor picked up on that, can you just describe briefly what you mean there? Sure, and maybe an example would be helpful. In San Francisco's permit, for instance, we have a narrative water quality based effluent limitation that requires San Francisco to increase its rate of pumping when wet weather is expected. So if there's a 30% chance of rain, we have to clear capacity in the facility so that we are able to absorb the capacity of storm water. That's a narrative water quality based effluent limitation. It tells us about the rate of our discharge, so it's squarely within the definition of effluent limitation, but it's simply a narrative form, and we don't object to that. It's perfectly fine to use words or numbers. We just want to know how to control our discharges and not have our compliance determined based on conditions in the receiving water. And the practical way this works, to pick up on Justice Alito and Justice Sotomayor's questions, let's say there are 10 different entities discharging at a particular source. If the water quality is not good in that area, EPA can go back to one or more of the 10 and tighten up the effluent limitations in the permits, which may take some time, as Justice Sotomayor points out. You have a quibble with that. But in any event, that's the means for EPA to do this, right? That's exactly correct. That tells permit holders the obligations they need to meet. So, yes, that's exactly how this works. And the overarching problem, I think, but you haven't gotten to this, so I'm going to give you in terms of how this all works, is you don't know what your obligations are ahead of time, and yet you're on the hook for millions of dollars in potential prison time, even though you didn't know what your obligations were ahead of time, which strikes at least me as definitely a policy problem but one that's rooted in the statute. You don't know what your obligations are, and you go to prison. Exactly, right. What are you on the hook for? There's an EPA suit against you. What is the amount San Francisco is on the hook for for something they didn't know they needed to do? At least that's your claim. What's the amount? What's the amount? So the statutory penalties are $66,000 per day per violation, so that can add up quite fast. They're seeking how much from you? I think it's in the millions. It's over 10 years of penalties that can add up quite quickly. Thank you. Justice Barrett? Justice Jackson? So I understand that you say that the issue here is whether the generic prohibitions are authorized by law. Is that right? That's right. And that's the core of your argument in that you say that Congress did not contemplate having this generic prohibition, but I guess I can't square that with 33.13.42Q1, which is the 2000 amendment in which Congress appears to be saying that each permit for a discharge shall conform to the When you look at the Combined Sewer Overflow Control Policy, that policy, I think, the long-standing policy of the agency, was to include these generic kinds of what you call generic kinds of limitations. I mean, it's very explicit in the policy. It says the authority should at least require permittees to comply with the applicable water quality standards. And apparently EPA had guidance that said it didn't matter whether this was Phase I or Phase II, these kinds of permitting conditions, we are going to put in our permits. So how can it be, given the amendment here, that Congress did not intend for these kinds of provisions to exist in permits? So there's nothing in the policy that authorizes the generic prohibitions. What Congress is authorizing is that EPA set limitations in a permit that require our compliance with water quality standards. They can do that through effluent limitations. No, no, Congress was very specific. It said we are requiring the permits to conform to the Capital Combined Sewer Overflow Control Policy. It was referencing a particular policy that had been established by the administration that included the generic prohibitions that you say Congress did not consider, endorse, or whatnot. And I don't understand how that's possible. So there's nothing in the policy itself that says EPA, impose restrictions on causing or contributing to a violation of water quality standards alone. That's not what the policy says. As we discussed, for Phase II permits, the policy expressly requires water quality. Was it EPA's guidance and weren't they saying this is what you have to do pursuant to our policy? EPA has never taken the position, I think, that their own policy did not require these. EPA's policy, EPA's guidance, not the policy itself, but EPA's guidance says conflicting things. It sometimes says for both Phase I and for Phase II permits that both require effluent limitations. Other times it gives something that looks like the generic prohibitions as an example of what to do. I think that just simply reflects the confusion. But what Congress actually blessed or required is compliance with the policy, and the policy does not require or authorize anything that looks like a permit. One final thing. Did you waive an arbitrary and capricious claim? I know Justice Thomas was talking with you about having an arbitrary and capricious claim, but I thought you would waive that. Our argument before this Court is that the generic prohibitions are not authorized by law. Thank you. Thank you, Counsel. Mr. Lu? Mr. Chief Justice, and may it please the Court, San Francisco's opening brief makes one and only one argument, that Section 1311B1C authorizes only effluent limitations. This Court, however, already rejected that argument in National Association of Manufacturers, and in any event, the statutory text and history make clear that Section 1311B1C also authorizes other limitations. San Francisco is therefore wrong to argue that limitations like the ones challenged here are never okay. But that does not mean that they are always okay. Under the statute, EPA may rely on limitations like the ones here, only when EPA lacks assurance that the permit's effluent limitations alone are insufficient to protect water quality. Even then, EPA may rely on limitations like the ones here, only when EPA lacks the information necessary to develop more tailored limitations. And finally, EPA may not impose limitations of any kind that are unconstitutionally vague. San Francisco pressed each of those limiting principles below, but the Court of Appeals rejected each of San Francisco's case-specific challenges. The Court held at Petition Appendix 40 that the permit's effluent limitations alone would be insufficient to protect water quality. The Court held at Petition Appendix 46-47 that San Francisco had failed to update its long-term control plan, thus depriving EPA of the information necessary to develop more tailored limitations. And the Court at Petition Appendix 32 rejected San Francisco's vagueness challenge. San Francisco did not seek this Court's review of any of those parts of the decision below. Rather than pursue an individualized challenge to the limitations in this case, San Francisco has put before this Court only a facial challenge, that all limitations that prohibit discharges based on their effects on water quality are invalid on their face because they don't fit the statutory definition of effluent limitation. Because that argument can't be squared with this Court's precedence or the statute itself, this Court should affirm. I welcome the Court's questions. Mr. Liu, do you agree that 1311 seems to focus primarily on affluence and discharge? I think basically all the provisions of 1311, except for 1311B1C, focus on affluent limitations. Now, that provision C talks about limitations, including those necessary to meet water quality standards, and it also mentions or required to implement any applicable water quality standards. How exactly does the generic limitation do that? It does in two senses. We think that phrase, necessary to meet or implement water quality standards, imposes two limitations on our authority. One, we can invoke B1C only when we lack assurance that the other limitations in the permit are insufficient to protect water quality. We think we've satisfied that condition here. The Court of Appeals so found, and San Francisco hasn't sought review of that. We think that language imposes a second limit, which is that for a limitation like this to be necessary, it needs to be necessary in the sense that EPA lacked the information necessary to develop a more tailored information. And here, that's satisfied too. I want to be clear about the sort of information that we're missing that made it impossible for us to impose anything other than these generic limitations. It's not information about the water. It's information about San Francisco's own sewer system. We're talking about where do the flows go, what's the conditions of the pipes and the pumping stations, how does the system respond to wet weather events. That's the information that we've been lacking for the past ten years and that we asked San Francisco to provide as part of the long-term control update. Without that information, we're basically flying blind as to how we're going to tell exactly what San Francisco should do to protect water quality. I'm sorry. I don't understand. The bad old days is when we had water quality standards, right? People didn't know what they were supposed to do, how it was going to be allocated, sort of a problem of the commons, and they put in the permit system. And I think the danger here is that you're going back to the other system. Because it, one, gives more power to you because you don't have to tell the people who are discharging what they have to do or not. You can sit back. And also, you don't even have to allocate among many different polluters who's responsible for what. So, what prevents you? I know you touched on a couple of things in response to Justice Thomas, but I'm not sure that was significant limitations from saying, as you're doing here, we're going to go with water quality standards because that's maybe harder for the people with effluent, but it's a lot easier for us. No, it's not easier for us. In our ideal world, we would have perfect information about how San Francisco's system works. And based on that information, we would be telling San Francisco things like reroute flows from X to Y, upgrade your pumping station at Seacliff, increase the storage capacity of your west side storage facility. We were unable to include limitations of that tailoring in this permit because San Francisco deprived us of the very information we would need to do that. We have no interest in putting in generic provisions like this when we have the information available to supply more tailored limitations. And that's precisely because it's so much easier to enforce a more tailored limitation. What do you do with multiple people discharging effluent and you have a water quality standard? There are eight different industries, 10 different water districts, whatever. They're all doing it, and you look at the water quality and you say there's too much of this. What do you do then? How do you allocate who's – this was the problem that led to the permit system. I mean, how do you allocate responsibility for that? There are provisions in the statute that authorize states in their development of water quality standards to apportion pollutant loads to different polluters. 1313D is an example of this. But I don't think that concern about multiple dischargers is any reason to throw out all of the receiving water limitations in this case. That sort of situation might be the basis for an individualized sort of as-applied type of challenge to a provisionalized challenge. How would an as-applied challenge work in that case? Somebody's supposed to come in and say, well, you put this much on me. I think you should put different amounts on those other three because I think they're doing more or they can afford more or they have more modern plants. And you're just going to go back and say, well, this is how we want to allocate. Oh, no, the statute supplies plenty of tools to address the problem of an over-polluted water body. The state can grant a variance or an exception from its standards as they've actually granted standards. You're talking about the specific question of allocating responsibility for the water quality to different point sources. Oh, well, one way to do it is for the state to say, look, we recognize this water body is over-polluted. Let's grant a variance to certain of the dischargers so that they can continue doing their business. But I just want to make this point. Their rule isn't going to fix the problem of the over-polluted water body. If a water body is, in fact, over-polluted, thus leaving no room for anyone else to pollute, the appropriate affluent limitation in that case is going to be zero. It's not as if Petitioner's rule is going to magically allow dischargers and petitioners. I don't understand that answer. It could be zero, but it may not have to be zero across the board. It may be 20% in each of the point sources. It may be 10% in the antiquated system that can't do any better, but 30% in someone else. And I'm saying what the permit system was designed to do was give some notice to the different dischargers about what was going to be required of them. Your water quality system gives you complete discretion in who's going to bear the burden and who's not. I don't think that's right. Like I said, there are multiple tools in the statute that address that problem. There are variances that the states can provide. There are schedules of compliance that EPA can provide in issuing the standards. The CSO control policy discusses apportioning pollutant loads so each discharger can stay within the load. But the problem is you can go after an individual entity like the city of San Francisco based on the past when they didn't know what the relevant limitation on them was and seek retroactively without fair notice huge penalties, including criminal punishment, based on something that they didn't know what they could discharge or not discharge. Correct? A lot of what you're talking about in response to the Chief Justice is here's things that could help going forward. Right. You're suing San Francisco separately for a lot of money based on a standard that they had no idea, you know, at least that's the theory. That's the theory in your position. Your position would allow that. I don't think so. Yes, it would. I mean the baseline complaint is Exhibit A for what you said is not going to be true. The standards that are violated in those cases are numeric water quality criteria. The standards, the generic limitations contain water quality standards that you don't know as an individual entity what you need to do to comply with that. You know, San Francisco has not pointed to any instance of that. The best shot they gave at pointing to a limitation that they said they didn't know what the meaning was was a standard that said marine communities can't be degraded. Well, if you look at Petition Appendix 143, there's a definition of degrade in Attachment A to the permit. That definition spells out exactly how one goes about figuring out how marine communities can be degraded. They talked about the algae just now. They talked about the natural taste, odor, and color of fish. Yeah, and you know, you can look at footnote two of their cert reply brief, and it says San Francisco did not challenge the clarity of any water quality standard below. And, you know, we're talking about algae for the first time. That's because they say as an antecedent matter, you don't have the authority under the statute to do so. They would have if you did have the authority separate, arbitrary. And my point is there's no reason to invalidate all of these on their face. No, the facial challenge thing is a total distraction. The question is whether the statute authorizes these kinds of generic limitations. It really comes down to what Justice Kagan was talking about, how you read that precise sentence. And if Congress had wanted to do away with these standards as limits entirely, it would have simply adopted the Senate version of the bill that was before it. The Senate version accomplished exactly what San Francisco is urging here. It very meticulously put the word effluent into 1311b1c, and then meticulously, in all the other provisions that cross-reference 1311, deleted or other. May I ask, Mr. Liu, is this a multiple discharge situation? There seems to be some conflict between the government's position and San Francisco's position on that. As I understood, Ms. Steele, she said that's true of one, what you say, but it's not true of all eight. What's the situation there? So there's no dispute it's true of the one, and the one is the only outfall at issue here because the one is the only federal outfall. There's a division of jurisdiction here between the federal government and the states. The states are the permitting authority for all the nearshore outfalls. That's the seven outfalls that my friend mentioned. But the only respondent here is the federal government. We are responsible for permitting the Southwest Ocean outfall, which is 3.3 miles into the Pacific Ocean. I see. And if this issue of, like, we don't know what we're supposed to do, it's horribly unfair, and you think, well, they've really not come up with any particular way in which that's true. I mean, I thought that most of these were something like this. There's a California water quality standard that says, waters shall not contain floating material in concentrations that adversely affect fishing and swimming. And it turns out EPA says that notwithstanding that standard, San Francisco has left lots of toilet paper floating in Mission Creek. I mean, that's not a we-don't-know-what-to-do issue. Like, we know you're not supposed to leave toilet paper floating in Mission Creek, don't we? That's right. That's one example. There are plenty of others. I mean, there might be examples where they don't know something, although they haven't come up with any. But there are plenty of examples. I could go on and on. There are plenty of examples where it's obvious. Don't, like, spew the kind of chemicals that discolor the water. It would be strange if concerns that are individualized to other types of limitations that may or may not be vague caused the court to throw out the whole set of these types of limitations. So we could limit the decision to items like that, but in terms of particular concentrations of chemicals that you cannot see floating in the water, we could reserve that decision because that interferes with the permit system in a way that the others may not. We would certainly appreciate a decision from this court that was tailored to the particular concerns that may be motivating petitioner's position. But to be clear, we understand petitioner's legal argument in this court, the textual hook on which they've hung their entire presentation, to be a facial challenge to these limitations. It's just an argument that the statute doesn't authorize these kinds of conditions. And the answer is just yes or no for us. And I don't think there's anything in 1311 B.1.C. I get that. EPA can include a standard that says don't cause floatable materials to be in the water. And you agree that all of these concerns would make you vulnerable to an arbitrary and capricious challenge. Let's just assume they're all right. I know you're disputing that they're vague or that they're not on notice, but if they were, you would be vulnerable to an arbitrary and capricious challenge. Yes. I mean, in this very case, San Francisco brought three variations of that type of challenge. They said the existing limitations in the permit are already sufficient. You don't need to resort to B.1.C. They said these limitations are vague. They said we gave you the information. We don't need to provide you more information via the updated long-term control plan to create more tailored limitations. How common are these permits? These ones that are more generic, narrative form, and they're getting a non-affluent limitation. So I would separate the universe into two buckets. There are individual permits like these where we're talking about an individual discharger, and then there are general permits that we issue that cover a whole swath of dischargers within a particular geographic area, like all construction sites, for example. These types of limitations are pretty common in the general permits, and the reason why is precisely because of this information problem. The more information we have, the more tailoring we can do. The less information we have, the less tailoring we can do. And the general permit context is one where we, and I think all the dischargers, value efficiency and very little administrative burden. So we don't ask for a lot of information, and they don't give it. In exchange, we do include these type of quote-unquote generic prohibitions. In the individual permit context, it's as applied to the circumstances. It really depends on where we are in the development of a permit. How often do you seek criminal penalties? We have never sought. I'm not aware of any instance, and I've been told we are not aware of any instance, in which we have pursued criminal prosecution of a municipality that violated a condition like this. And Mr. Liu, you said at one point that you lacked the information necessary to provide a more specific provision than the provisions that are in question here. But is there anything that prevented you from obtaining whatever information you thought you needed? Yes, San Francisco, under the statute. You have no ability, and the state has no ability, to require them to produce any information? We did require them. We issued information requests under 33 U.S.C. 1318A. All of that resulted in San Francisco coming up in 2018 with what I call a long-term control plan synthesis. That synthesis did not reflect current conditions. Why? Because the most recent document in that plan was dated in the 1990s. And when a regulated party doesn't provide the information that you think you need, do you lack tools to require that to be done? No. What we did here, because it had been five years since your last permit had expired, the only way we thought, the best way left to get the information, was to put the requirement in the next permit. And so in the instant permit, we said, as a condition of this very permit, this is Petition Appendix 131 to 138, please provide us with the information we need to develop more tailored limitations. And in that request, Pet App 135, we said, while you're at it, why don't you tell us what additional control alternatives you think make sense, given your existing infrastructure and the cost? So do you want us to hold, and maybe this would be an appropriate disposition of this case, that permit requirements like these are permitted in the specific situation in which EPA or the state has made every reasonable effort to get the necessary information from the regulated party, and the regulated party has refused to provide the information. In that limited situation, you can resort to this sort of permit condition. Yes, our reading of the statute is, to satisfy the requirement that these be necessary to implement, they need to be necessary in the sense that we lack the information necessary to develop more tailored information. In that response, and some of the other arguments that you've made, suggest that perhaps what you're saying is that we never should have granted review in this case the broad question that was presented in the CERT petition. I am saying that. I mean, just track the shifting positions that we've seen thus far. The CERT petition, the certiorari petition, focused on whether these provisions were too vague or not specific enough. We responded to that in our opposition, and the response we got in the CERT reply was, we're disclaiming any argument that any standard or any limitation was too vague. We're shifting to an argument based on the meaning of effluent limitation and the definition of it. We get their opening brief. It's consistent with the CERT reply. But then, page three of their merits reply starts out by saying, even if this provision does authorize things other than effluent limitations, they're still invalid. Mr. Liu, can I invite you to go back to the text and comment on the statutory interpretation question, which is what I understood counsel on the other side to say, this all reduces to whether or not the statute authorizes these kinds of generic limitations. Her argument, I mean, the way I'm looking at the statute, we have, A, talking about the discharge being unlawful, and B, talking about the objectives. B1A is specific to effluent limitations, and then there's some subsections about those. And then C says, any more stringent limitation, including those necessary, et cetera. So, on its face, it looks like any more stringent limitations is taking us outside of effluent limitations, because the more is relevant to something or relative to something. But she suggests that A1 is setting effluent limitations with the best practical, control technology requirement, and the any more stringent limitations is limited to allowing, or is allowing for effluent limitations that go beyond best control. Do you understand what I'm saying? She suggests that it's still cabined by effluent limitations. And I guess I'm wondering what we do with any more stringent limitation. Doesn't that defeat her argument, or how does the government respond to that? Yeah, I think the short answer is if Congress wanted to limit B1C to any more stringent effluent limitation, Congress would have put in the word effluent there. After all, effluent limitation is a statutorily defined term. Mr. Liu, I think that addresses the primary argument. I haven't heard, and I'd appreciate some response. I just want to hear what you have to say about the second, what I understood, at least, to be the secondary argument is even if B1C allows other limitations, it is necessary to meet a water quality standard, which means they can't mean the same thing. In other words, a limitation can't be the water quality standard. It has to be some restriction on discharge. That's what 1311 is all about, you said. A says that. The title says that. Some limitation on what they do, rather than just saying, creating a circle, that the limitation is a water quality standard. Congress meant those two terms to do different work. Well, under the statute, there's always a distinction between the limitations and the water quality standards. Yes, and I'm wondering what remains of that when you say, hypothetically, in a limitation, do not violate the water quality standards. Do not cause or contribute to the violation of water quality standards. Well, as my friend acknowledged. Is it circular, or is there some way to break the circle? I don't think it's circular. As my friend acknowledged, the water quality themselves are not self-executing, and so it's natural to describe it. For sure. For sure, I get that. But when you just say, go forth and do good, okay? Right? Or, you know, do not create a nuisance. Or, you know, don't. What is it? One of them is, do not cause aesthetically undesirable dislocation, discoloration of the ocean. That's our water quality standard. And you put that. Is that a limitation on what they do, on what they discharge, in any meaningful sense? Or is that the water quality standard itself? I think it is a limitation on the discharge. It's prohibiting an entire category of discharges, i.e., those that fit that description. And if you look at the text of the limitations themselves, they're written in terms of what the discharges can or cannot do. If that's the case, then I guess I'm kind of circling back to the Chief Justice's question, and really maybe administrative agencies generally. The point was to give people notice ex ante of their legal obligations rather than rely on tort ex post, nuisance law. What value added is there to just an ex post tort nuisance law regime when you say, don't create a nuisance? Well, as I think the prior discussion also revealed, a lot of these water quality standards are not self-executing. They're not independently enforceable. And so the only way these standards are applied to a discharger like San Francisco is if we incorporate those standards in a limitation. We need these limitations to bridge the gap between the existence of the standards, which merely specify a desired condition of the waterway, and the permittee's own responsibilities. I understand that. But does it add anything to an ex post tort nuisance regime? I think it does. I mean, to be honest, these standards are much more specific than just the general tort regime.  I could call an expert witness up, though, and say, here's what constitutes a nuisance, or I can point to what EPA's water quality standards are, and I'm not sure what difference as a practical matter it would make. I think Congress would, the Congress of 1972, would vociferously disagree. I mean, they thought water quality standards were the linchpin on which the water of the United States would be made clean. I agree with that. And they didn't think. No, I'm just asking as a practical matter, if we're essentially saying, don't create a nuisance, and EPA sets the standard as opposed to an expert witness, what value has been added? To be clear, it's the states that are setting the standards. EPA is merely issuing permits so that the state's own view of clean water can be achieved. So that even begs the question further, right? If this is just a circle, the state standard is the state standard. That would be set in nuisance law too. And this was basically the arguments that the proponents of the House bill made. They said, why do we even need state water quality standards anymore? Let's take out of the statute 33 U.S.C. 1313. But the House bill retained the water quality standard provision.  Because then you were going to have an administrative agency ex ante create limitations on what you can do as a permittee in order to make sure that those water quality standards were met. But if you take that away, and there's no ex ante limitation anymore on what you can do, aren't we just sort of back to a state law nuisance regime in which the state is setting the standard of care? I don't think so. I mean, these limitations incorporate much more specific standards than just general state tort law. They say things like, don't cause floatable materials to be in the water. Don't cause the water. That would be pretty good evidence of the duty in a nuisance suit, wouldn't it? The duty of care? It may well be. It may not be. I think Congress, one of the problems with the prior regime wasn't that enforcement of these standards was unfair, but that it was nonexistent. And so Congress actually wanted to up the ante. You don't think Congress wanted to ensure advance notice to permittees of their obligations under the law? That wasn't part of the purpose? I think if permittees think they lack fair notice, they can bring that sort of challenge. Mr. Lube, my question was, was part of what Congress is trying to do is, as the Chief Justice indicated, try to provide some certainty on the ex ante rather than just adjudicating all this ex post and nuisance cases? Yeah, I think San Francisco actually knows well what it can do to improve its own sewer system. I mean, San Francisco is an outlier here. I got it. You know, some of these standards are not as specific. Marine communities shall not be degraded. The odor of fish shall not be altered. I mean, to take the first example, Justice Kavanaugh. It's just hard. I'm not looking for comment on the specific example. It's just hard to know in advance when multiple other people are also discharging into the same waters when you're going to have crossed the line. I don't think that concern can justify throwing all of these out across the board. Well, Justice Gorsuch's question was, I think, and the Chief Justice's, combining the water quality standards and the affluent limitations. And part of what we have to do is figure out how they fit together in 301 there, B1C. And it strikes me that the way Congress ensured both more effectiveness and fair notice was to say that the end is water quality standards, things like this, discoloration of fish, marine communities, etc. But the means to the end were affluent limitations, which would both be, as the Chief Justice said, more effective and, as Chief Justice Gorsuch said, fair notice. And if they're not tight enough, EPA has mechanisms to tighten them up. What's wrong with that reading of the two things together? I think it would read the statute. How does that hurt EPA, if you want to respond to that? How does that harm EPA's ability to regulate if they have to do it that way? Oh, it's going to lead to more permit denials, more permit delays, as we wait for the information to come in. It's going to lead to less flexibility and more burdens for the dischargers. Again, look at the context of general permits. These cover the vast majority of NPDES dischargers. They're covered by general permits. And the whole point of the general permit is that the dischargers can get away with not providing us a lot of information. That's how you get a construction site approved in 14 days. You take away our ability to rely on these sorts of prohibitions, and we're going to need to ask for more information, because it's only with that information that we're going to be able to develop more tailored limitations that assure us that water quality standards are going to be achieved. Thank you, Counsel. Justice Thomas, anything further? Justice Alito? Do we know to what degree the problem with the water quality and the affected body of water is the result of water that the city is intentionally discharging, and to what degree it is the result of these sewer overflows? Well, I don't think San Francisco is intentionally discharging anything. Well, the water that it treats. It treats water, and some water flows out when there's an overflow. Yeah. So the permit in Attachment E contains a long list of monitoring locations, and those locations help us disaggregate what's causing what. So there are monitoring locations that sample the flow out of the treatment facility, and that tells us the quality of the discharge there. And then there are monitoring locations that sample the effluent coming out of the outflow issue here, as well as along the shore and in the ocean. All right. Thank you. Justice Sotomayor? Mr. Liu, maybe I need to start from the beginning. When you're obligated to give effluent limitations, could you give a permit that says just meet water quality controls? No. Why not? Because the statute says exhaust the technology-based effluent limitations first, and we read more stringent to mean resort to the B1C authority only when those technology-based effluent limitations are met. You called this an individual permit versus a general permit. Right. I'm not sure I understand what each is. I know that this is a permit that's issued to San Francisco for its combined rainwater or stormwater and sewage systems. So it's individual in that sense. What does that mean as opposed to a general permit? So you've exactly accurately described the individual permit here. A general permit, you know, the prototypical one is our construction general permit. And what it says is all the people who want to engage in construction in a particular geographic area, it can be a whole state or set of states, if you want to engage in construction, file with us a notice of intent to do that, and within 14 days you'll have authorization to do it. And part of that authorization is basically an agreement that once you get that authorization, you're going to abide by the terms of that general permit. And the general permit has a long list of conditions but typically includes a provision like this. And the reason why we are unable to provide a more tailored limitation in the general permitting context is that everyone in that context agrees that the lack of information is a good thing. No constructor, no one engaged in construction wants to take the six months to a year to apply for an individual permit. They want to be able to get that authorization quickly and efficiently. But the tradeoff between not having that information about how their individual site operates is that we have to rely on a more general provision like this. So this presumes a general permit, presumes when it's talking about a general category of industry, that certain protocols are being followed. Those protocols generally produce X amount or Y amount of pollutants or effluents, and we're saying you can do that, but only if you're going to go over those set limits are we going to require you to step in and do something else, correct? Yes, exactly. That's what happens with a general permit. Now, this individual permit, there was a concern by the Chief Justice that this individual permit, they have many point sources of the sewage coming in. I mean, everybody's bathroom is a point source. And they have, yeah, that's what sewage is, isn't it? It's what goes into the sewer waters, okay? And that unless they know, unless they have effluent limitations, they won't know how to control those individual point sources or figure out how to control who's the bad actor here, what neighborhood's the bad actor. Does that matter in a situation like this? No, it doesn't matter. Explain why. Well, because the one point source of that issue here, the one that's within the federal government's jurisdiction, is the Southwest Ocean outfall. And that outfall discharges into the Pacific Ocean 3.3 miles away from the coast. And there are no other dischargers, I think my friend acknowledged this morning, there are no other dischargers in the vicinity. So there's no possibility of confusing San Francisco's contribution to water quality versus anyone else's. So your effluent limitations are already telling it, control all these things that we know you can control and control them in this way because there's better technology you could put in. Yes, this permit exhausts, as far as we can exhaust, the technology-based effluent limitations. Now, what you're saying with respect to the other water standards that you're incorporating by reference is we can't tell that because whatever reasons. Yeah, well, here's what we do know. We do know that San Francisco's system is resulting in 196 million gallons of sewage poured onto San Francisco's beaches. We know that it's leading to sewer backups into homes and businesses. We know that their infrastructure is aging and failing. We know that the discharges are leading to excessive concentrations of bacteria, copper, and other metals. So we know that the limitations that already exist in the permit are not enough to protect water quality. Then the question is, how do we fill that gap? And we would like to fill that gap with additional effluent limitations. After all, they're easier for us to enforce. But I think the last thing San Francisco wants us to do is to start telling them what to do without the information of how their system works. We could write into the permit, reroute flows from X to Y. That goes back to Justice Alito's point, which is you don't mind an opinion that says you can only do this if you don't have enough information to issue. You don't mind an opinion that says that. Justice Kagan, anything further? Yeah, so that's true for the individualized permit holders. And then you said for the general permits that you issue, if we took up this invitation to say that this mechanism is just not authorized and you could not write the general permits that you write in the way that you do, what would you do instead? And who would suffer from that? All the small businesses, small farmers that rely on the general permits. These are permittees who don't have the huge companies that are able to navigate what admittedly can be a complicated individualized permit system. They rely on the simple thing of filing a form with us and being able to engage in construction 14 days later. And so saying we cannot across the board rely on these provisions is going to undermine the whole point of the general permit system and affect the economy of small business owners. And one last question is how long have you been doing this for in either the individualized context or the general context? When did this start? Is this a consistent practice that EPA has developed? So in the CSO context, it certainly has existed since the CSO policy itself in 1994, which we understand as blessing this sort of condition. So in this particular context, almost 30 years. That's right. I guess what I would say is, again, it's our view of the statute that when we are able to avoid relying on these, we should avoid relying on these. Discharges raise concerns, but we have concerns, too. I mean, the Second Circuit case that was alleged to be in conflict with the decision below was a case brought by NRDC. And they said, well, these are hard to enforce. And so stepping into those shoes, they are, indeed, harder to enforce. In an ideal world, we would be able to get perfect information and then use that information to craft very tailored limitations that are specific to a particular site and particular discharges. It's just in the real world, we lack that information. Thank you. Justice Gorsuch? Justice Kavanaugh? I have a few questions. You just referenced farmers would be helped by the Farm Bureau Federation is in here representing 6 million farm families, along with an amicus brief that represents, as they say, nearly every business sector across the U.S. economy. They're not happy with just leaving it up to you to represent their interests, frankly. And they say that your position will make it impossible for many permittees to protect themselves from unanticipated liability. They say that their members, including the Farm Bureau Federation, those farmers and other permittees, are left exposed to the potentially devastating and unnecessarily costly consequences of government enforcement action or citizen suit. So they're not happy with trust us. Do you want to respond to the Farm Bureau Federation? Sure. I think all regulated parties would prefer to essentially have their cake and eat it, too, to not have to give us the information but also not have to face these generic prohibitions. So I think the message of that brief is that in their ideal world, not only would they not have to give us the information, but they wouldn't have to meet the more generalized prohibitions. The statute takes that option. And it's only they're aware of that and filed the amicus brief with that in mind. But in any event, on to the next one. On what you said to Justice Alito about what the opinion could say, and you said when we should avoid relying on these when we can avoid relying on these, would you be okay with an opinion that said we must avoid relying on these when we can avoid relying on these? Yeah, I want to be careful here because of the general permitting context. I think this is a balance of priorities. And in some contexts, like the general permitting context, the lack of information is an affirmative good. It is something we don't want to demand more information, and I don't think any of the dischargers actually want to have to go through the rigmarole of actually providing it. And so when there is good reason that we don't have the information necessary, whether it's because of resistance by a party like San Francisco or because it just doesn't make sense to demand more information, then I don't think these limitations should be invalidated. On the criminal penalties point that Justice Barrett raised, and you said that hadn't been pursued, but obviously civil and citizen suits are pursued. And how much are you seeking from San Francisco? So we have not calculated the damages. Roughly? I mean, I don't have a rough, even back-of-the-neck estimate. Tens of millions? Hundreds of millions? It may well be tens of millions of dollars. I think what that reflects is the over-decades-long failure of San Francisco to update a system that it itself and its own planning documents, CAER 947, admits are aging and deteriorating. Thank you. Justice Barrett? Just a quick follow-up to that. I think when I asked you that question about criminal penalties, you cabined your answer to municipalities. Have you pursued them in the context, in this general permitting context, on farmers or small businesses? So I don't think so. I don't know for sure. Is that why you cabined your answer to municipalities? No, I think it is only because I had an answer for municipalities. My answer in the other context is I don't know. But here's what I can tell you. We view it as exceedingly difficult to obtain a criminal conviction for violating a provision like this. That's because of the mens rea requirements in the statute, as well as the beyond reasonable doubt burden of proof. And the other thing I would say is we have no interest in pursuing criminal penalties because when we have a situation like this where the welfare of a whole city is at stake, our main concern is prospective injunctive relief. Our main focus is not to see who we can penalize and put in jail. Our main focus is how can we make this situation better going forward? So our main tool for rectifying a situation like this is to seek civil prospective injunctive relief. Thank you. Justice Jackson? I'm a little surprised by the suggestion that the goal of the statutory permitting process here was fair notice. I thought the goal was to ensure that there were clean waters in the United States and that that was not actually happening under the previous regime, and so Congress was giving the EPA additional tools to effectuate that result. That's correct. And the problem with the pre-1972 regime was not that it was unfair. It wasn't that enforcement under the pre-1972 regime was unfair. It was that it was nonexistent. Right. So we don't have congressional findings, for example, that the statute needs to be interpreted consistent with an understanding of what would be most fair to the polluters who are putting the sewage into the water. Is that correct? I'll say this. I think Congress struck a balance in the statute between pursuing clean water and protecting the prerogatives of polluters. How so? If you look at 1319D, there is a statutory penalty provision that says when courts are crafting the correct amount of statutory penalties, courts should take into account things like the seriousness of the violation, the economic impact of the penalty on the water. I thought you were going to say in terms of the direct statutory interpretation that you're putting forward here. I hear the balance in your statement that effluent limitations, it's clear from the statute, are the first go-to in trying to ensure that the waters are clean, but that what C is doing is also allowing for other kinds of limitations to potentially include generic limitations when the effluent limitations don't suffice. That's what I thought your argument was.  And that's why I think it's not circular in any sort of real sense because these other limitations are being adjudged relative to the effectiveness of the effluent limitations. So they only come in as necessary to make sure that we reach the clean water standards when the effluent limitations aren't working. Exactly. And San Francisco below made the argument that, well, these limitations are not necessary because in their view the other limitations in the permit were already sufficient to protect water quality. And the Ninth Circuit rejected that argument, and there was no cert petition on that issue. Thank you. Thank you, Counsel. Rebuttal, Ms. Steele? San Francisco's ask in this case is simple. We simply want to understand our permit limitations so that we can comply with them. My friends on the other side say they use the generic prohibitions when they lack information. That's simply inconsistent with the way this is actually played out. As we've noted in our reply brief, certain divisions of EPA have put this in every permit they issue. They've been very common in San Francisco. But EPA already has tools that address lack of information. They have an entire regulatory guidance document for their permit writers that tells them exactly how to do it. And it tells them to set water quality-based effluent limitations with a re-opener clause in the permit that allows them to reopen the permit and impose additional limitations when they need to. And in San Francisco's particular circumstance, we've been sending monitoring information to EPA for decades about this facility. It's a well-known facility to EPA. I'd like to correct a couple things. Justice Kavanaugh, my colleagues here have calculated the numbers for the amount sought in the litigation for the Bayside permit. And it comes to $10 billion. That's the statutory penalties for the days at issue. And in terms of what's covered under our permit, all of the outfalls are covered. You'll see that at Petition Appendix, page 428. There's one permit that governs the entirety of the facility and all of its outfalls. It's joint by the state regional board and EPA, but it's one system of obligations that covers all of the outfalls. And then finally, I'd like to explain as another example of why this is such a hardship for San Francisco. And I'll use our friends in L.A. as an example. Los Angeles versus NRDC on remand from this court. The Ninth Circuit considered a cause and contribute requirement that's nearly identical to the one before this court. In that case, NRDC argued that monitoring data alone, monitoring data showing an exceedance of water quality standards was enough by itself to impose liability in Los Angeles. Los Angeles said, look, there's 80 other dischargers into this water. It's not just us. You need to show something about our own discharges in order to find liability. The Ninth Circuit said no. The Ninth Circuit said the monitoring of data alone exclusively per se established a violation of law with no need to show anything about Los Angeles' own discharges. This is the problem here. With such a broad standard, with such a broad basis for liability, cities like Los Angeles and like San Francisco can be subject to liability without any advance notice that anything about our discharges is going to cause a problem and without the ability to prevent that liability. Thank you, Counsel. The case is submitted.